In re WORLDCOM, INC. SECURITIES
LITIGATION

This Document Relates to:

ALL ACTIONS.

No. 02 Civ. 3288(DLC).

United States District Court,
S.D. New York.

May 19, 2003.

Max W. Berger, John P. Coffey, Bernstein Litowitz Berger & Grossman LLP, New York City, Leonard Barrack, Gerald J. Rodos, Jeffrey W. Golan, Barrack Rodos Bacine, Philadelphia, PA, for Lead Plaintiff in the Securities Litigation.

David Wertheimer, Lyndon Tretter, Hogan & Hartson, New York City, for Defendant Bernard J. Ebbers.

Juliet Rotenberg, Arnold & Porter, Washington, DC, for Defendant Scott Sullivan.

N. Richard Janis, S. Robert Sutton, Janis Schuelke & Wechsler, Washington, DC, for Defendant David F. Myers.

Lisa F. Fishberg, David Schertler, Coburn & Schertler, Washington, DC, for Defendant Buford Yates, Jr.

Paul Curnin, Simpson Thacher & Bartlett, New York City, for Director Defendants.

Jay B. Kasner, John Gardner, Skadden Arps Slate Meagher & Flom LLP, New York City, for Underwriter Defendants.

Eliot Lauer, Curtis Mallot Prevost Colt & Mosley LLP, New York City, for Defendants Arthur Andersen LLP, Melvin Dick and Mark Schoppet.

William R. Maguire, Derek J.T. Adler, Sarah K. Loomis, Hughes Hubbard & Reed LLP, New York City, for Defendant Andersen UK.

James J. Sabella, Sidley Austin Brown & Wood, New York City, William F. Lloyd, Jeffrey R. Tone, David A. Gordon, Sidley Austin Brown & Wood, Chicago, IL, for Defendant Andersen Worldwide Societe Cooperative.

Martin London, Richard A. Rosen, Paul Weiss Rifkind Wharton & Garrison, New York City, for Defendants Salomon Smith Barney, Inc., Citigroup Inc., and Jack Grubman.

## OPINION AND ORDER

COTE, District Judge.

WorldCom, Inc. ("WorldCom"), once a giant of the telecommunications industry, is now the subject of colossal litigation. On July 21, 2002, WorldCom filed the largest bankruptcy in United States history. WorldCom executives have pleaded guilty to violating the securities laws; WorldCom's stock and bondholders, including numerous state and private pension funds, have lost hundreds of millions of dollars in investments; state and federal governments have conducted investigations into WorldCom's ascent and collapse; and those associated with the company have been sued in venues across the country. This Opinion addresses the motions to dismiss the consolidated class action complaint filed in the multi-district securities litigation.

Plaintiffs contend that WorldCom officers, directors, auditors, underwriting syndicates, and its most influential outside analyst disseminated materially false and misleading information. The false information appeared in analyst reports, press releases, public statements, and filings with the Securities and Exchange Commission ("SEC") from April 1999 through May 2002, including registration statements issued in conjunction with WorldCom's May 2000 note offering ("2000 Offering") and May 2001 note offering ("2001 Offering," together the "Offerings"). Plaintiffs allege that as WorldCom faced growing pressure to satisfy increasingly unrealistic earnings expectations, the company engaged in a series of illegitimate accounting strategies in order to hide losses and inflate reported earnings. By concealing losses to exaggerate reported earnings, plaintiffs argue, WorldCom affected the price of its securities and misled investors regarding the true value of the company.[1]

On April 30, 2002, the first securities class action in connection with these events was filed in this district. At least twenty related class actions had been filed here by the end of the summer. By Order dated August 15, 2002, the actions were consolidated under the caption *In re WorldCom, Inc. Securities Litigation ("Securities Litigation")*. The New York State Common Retirement Fund ("NYSCRF") was appointed lead plaintiff, and filed a Consolidated Amended Complaint on October 11 ("Complaint") adding three more named plaintiffs. Plaintiffs filed suit on their own behalf and as a class action on behalf of all persons and entities who purchased or acquired publicly traded WorldCom securities between April 29, 1999 and June 25, 2002, including those who acquired shares of common stock in the secondary market or in exchange for shares of acquired companies pursuant to a registration state-

---

1. This Court has already issued a number of opinions and orders in this litigation. *See In re WorldCom, Inc. Sec. Litig.*, Nos. 02 Civ. 3288, 03 Civ. 167, 03 Civ. 338, 03 Civ. 998(DLC), 2003 WL 21031974 (S.D.N.Y. May 5, 2003) (remand); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 1563412 (S.D.N.Y. Mar. 25, 2003) (severance); *In re WorldCom, Inc. Sec. Litig.*, Nos. 02 Civ. 3288, 02 Civ. 8981(DLC), 2003 WL 716243 (S.D.N.Y. Mar. 3, 2003) (remand); *In re Worldcom, Inc. Sec. Litig.*, Nos. 02 Civ. 3288, 02 Civ. 8981, 02 Civ. 9520(DLC), 2002 WL 31867720 (S.D.N.Y. Dec. 23, 2002) (individual actions); *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2002 WL 31729501 (S.D.N.Y. Dec. 5, 2002) (stays); *In re WorldCom, Inc. Sec. Litig.*, 234 F.Supp.2d 301 (S.D.N.Y.2002) (discovery); *In re Worldcom, Inc. Erisa Litig.*, No. 02 Civ. 4816(DLC), 2002 WL 31599531 (S.D.N.Y. Nov. 18, 2002) (lead plaintiff); *In re Worldcom, Inc.*, No. 02 Civ. 4816(DLC), 2002 WL 31095170 (S.D.N.Y. Sept. 18, 2002) (consolidation); *Albert Fadem Trust v. Worldcom, Inc.*, No. 02 Civ. 3288(DLC), 2002 WL 31059859 (S.D.N.Y. Aug. 15, 2002) (consolidation and lead plaintiff); *Albert Fadem Trust v. Worldcom, Inc.*, No. 02 Civ. 3288(DLC), 2002 WL 1485257 (S.D.N.Y. July 12, 2002) (stay).

ment, and those who acquired WorldCom debt securities in the secondary market or pursuant to a registration statement. Plaintiffs allege violations of Sections 11, 12 and 15 of the Securities Act of 1933 ("Securities Act") and of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b–5 promulgated thereunder.

Drawing from the allegations in the Complaint, Part I of this Opinion identifies the parties and Part II describes the alleged fraud. Part III describes the legal standards that apply to the motions to dismiss. Part IV addresses the merits of each defendant's motion.[2] The defendants' motions are addressed in the following order: (1) Bernard J. Ebbers; (2) directors; (3) underwriters; (4) Jack Grubman, Salomon Smith Barney, and Citigroup, Inc.

The Complaint is lengthy and detailed. The descriptions that follow summarize the allegations that are most relevant to the motions addressed in this Opinion.

## I. The Parties

### A. Plaintiffs

#### Lead Plaintiff

NYSCRF invests the assets of the New York State and Local Employees' Retirement System and the New York State and Local Police and Fire Retirement System and is the second largest public pension fund in the United States. During the class period, NYSCRF purchased WorldCom stock and WorldCom MCI tracking stock, and lost over $300 million in its investments.

#### Additional Named Plaintiffs

Three entities have joined the action as named plaintiffs. The Fresno County Employees Retirement Association ("FCERA"), a California entity, purchased

WorldCom stock and debt, including at least $3 million of notes offered in World-Com's 2001 Offering. The County of Fresno, California ("Fresno") purchased over $6 million of notes in WorldCom's 2000 Offering. HGK Asset Management ("HGK") is a registered investment advisor and acts on the behalf of union-sponsored pension and benefit plan clients pursuant to ERISA, 29 U.S.C. § 1001 *et seq.* During the relevant period, HGK purchased nearly $130 million of WorldCom debt securities, including approximately $43 million of notes in the 2000 Offering and over $29 million of notes in the 2001 Offering.

### B. Defendants

#### WorldCom Executives

Four of WorldCom's former executive officers are named as defendants. Bernard J. Ebbers ("Ebbers") was the President, Chief Executive Officer and a World-Com Director during the class period. He resigned from the company under pressure on April 29, 2002. Ebbers has not been indicted on criminal charges relating to WorldCom. The Complaint pleads claims under Sections 11, 15, 10(b), and 20(a) against Ebbers (Counts I, II, VI, and VII). Ebbers moves to dismiss all claims against him.

Scott D. Sullivan ("Sullivan") was WorldCom's Chief Financial Officer and a Director during the class period. After Ebbers's resignation, Sullivan served as Executive Vice President from April 30, 2002 until June 25, 2002, when WorldCom terminated his employment. In a criminal complaint dated July 31, 2002, Sullivan was charged with felonies in connection with his activities at WorldCom, including

---

**2.** Arthur Andersen LLP, Andersen Worldwide SC, Andersen UK, and Mark Schoppet have also moved to dismiss the claims against them

in the *Securities Litigation.* their motions will not be fully submitted until May 30, 2003, and are not addressed in this Opinion.

securities fraud, conspiracy to commit securities fraud and making false filings with the SEC. He was arrested on August 1, and indicted on August 28, 2002. The Complaint pleads Section 11, 15, 10(b), and 20(a) claims against Sullivan.[3]

David F. Myers ("Myers") was WorldCom's Controller and a Senior Vice President. He resigned from the company on June 25, 2002. On September 26, 2002, Myers pleaded guilty to charges of conspiracy, securities fraud, and the filing of false documents with the SEC. The Complaint pleads Sections 15, 10(b), and 20(a) claims against Myers.[4]

Buford Yates, Jr. ("Yates") was WorldCom's Director of General Accounting. On October 7, 2002, Yates pleaded guilty to securities fraud and conspiracy to commit securities fraud. The Complaint pleads Sections 15, 10(b), and 20(a) claims against Yates.[5]

### WorldCom Directors

The WorldCom Directors consist of Clifford Alexander, Jr., James C. Allen, Judith Areen, Carl J. Aycock, Max E. Bobbitt, Francesco Galesi, Stiles A. Kellett, Jr., Gordon S. Macklin, John A. Porter, Bert C. Roberts, Jr., John W. Sidgmore, and Lawrence C. Tucker ("Director Defendants").[6] The Complaint pleads Section 11, 15, and 20(a) claims against all Director Defendants. All Director Defendants move to dismiss the Sections 15 and 20(a) claims (Counts II and VII); none have moved to dismiss the Section 11 claim (Count I).

Director Defendants Allen, Areen, and Galesi were members of the Audit Committee of the Board, and Bobbitt its Chair, during the class period ("Audit Committee Defendants"). Count VI pleads a Section 10(b) claim against the Audit Committee Defendants. They move to dismiss the claim.

Director Defendant Kellett was the Chairman of the Compensation Committee of WorldCom's Board. Count VI pleads a Section 10(b) claim against Kellett. He moves to dismiss this claim.

### Accountants and Auditors

The Complaint pleads claims against WorldCom's outside auditors and accountants, Arthur Andersen LLP, Andersen UK, Andersen Worldwide SC, and Andersen partners Mark Schoppet and Melvin Dick ("Andersen Defendants"). Plaintiffs claim that the Andersen Defendants are liable for violations of Sections 11 and 10(b) (Counts III and XIII).

### Underwriters

The Complaint pleads Sections 11 and 12(a)(2) claims against underwriters consisting of Salomon Smith Barney, Inc. ("SSB"), J.P. Morgan Chase & Co., Banc of America Securities LLC, Deutsche Bank Securities Inc., now known as Deutsche Bank Alex. Brown Inc., Chase Securities Inc., Lehman Brothers Inc., Blaylock & Partners L.P., Credit Suisse First Boston Corp., Goldman, Sachs & Co., UBS Warburg LLC, ABN/AMNRO Inc., Utendahl Capital, Tokyo–Mitsubishi International plc, Westdeutsche Landesbank Girozentrale, BNP Paribas Securities Corp., Caboto Holding SIM S.p.A., Fleet Securities, Inc., and Mizuho International

---

**3.** By Order dated December 5, 2002, Sullivan's request for a stay of litigation against him was granted, and he does not now move to dismiss.

**4.** By Order dated December 5, 2002, litigation as to Myers was stayed; he does not now move to dismiss.

**5.** By Stipulation and Order dated May 6, 2003, litigation against Yates was stayed. He does not now move to dismiss.

**6.** The Complaint identifies Ebbers, Sullivan, Myers, Yates, and each of the Director Defendants except for Porter as the "Individual WorldCom Defendants."

plc ("Underwriter Defendants"). The Underwriter Defendants move to dismiss both claims against them (Counts IV and V).

The allegations against the Underwriter Defendants arise from two bond offerings made by WorldCom: the 2000 and 2001 Offerings. SSB and J.P. Morgan served as lead managers of the 2000 Offering. Banc of America, Chase, Deutsche Bank, Lehman Brothers, Blaylock, Credit Suisse, Goldman Sachs, and UBS Warburg joined in underwriting the $5 billion 2000 Offering. The registration statements and prospectus documents filed in connection with the offering ("2000 Registration Statement") are alleged to have included WorldCom's materially false financial statements for 1999 and to have incorporated by reference other SEC filings for WorldCom that contained materially false information.

SSB was the lead underwriter for the 2001 Offering. Together with J.P. Morgan, Banc of America, Deutsche Bank, Blaylock, Mitsubishi, Westdeutsche, BNP Paribas, Blaylock, Caboto, Mitzuho, ABN/AMNRO Inc., Utendahl and Fleet Securities, Inc. they underwrote the $11.8 billion 2001 Offering. The documents alleged to have constituted the May 2001 registration statement ("2001 Registration Statement," together with the 2000 Registration Statement, "Registration Statements") contained false and misleading financial information for WorldCom for the years 1999 and 2000, and incorporated by reference other SEC filings with false information about WorldCom's finances.

**Citigroup, Inc. SSB, and Jack Grubman**

The Complaint pleads claims against Citigroup, Inc. ("Citigroup"), a financial services company; SSB, a Citigroup subsidiary; and Jack Grubman ("Grubman"), the high-profile SSB telecommunications analyst (together "SSB Defendants"). In addition to the two claims in Counts IV and V against SSB as one of the Underwriter Defendants, the Complaint alleges that SSB and Grubman violated Section 10(b) in connection with the 2000 and 2001 Offerings (Count IX), and, in a separate Count, in connection with Grubman's analyst reports (Count X). The Complaint also pleads a controlling person claim pursuant to Section 20(a) against SSB and Citigroup for Grubman's analyst reports (Count XI). Citigroup, SSB and Grubman move to dismiss all counts against them.

## II. The Fraud

For many years, WorldCom grew by acquisitions. By 1998, it had acquired more than sixty companies in transactions valued at over $70 billion. Its largest acquisition was of MCI on September 14, 1998, a transaction valued at $40 billion. In early 2000, however, its attempt to acquire Sprint collapsed. During this period of acquisition-driven expansion, WorldCom had used accounting devices to inflate its reported earnings. Senior WorldCom management instructed personnel in the company's controller's office on a quarterly basis to falsify WorldCom's books to reduce WorldCom's reported costs and thereby to increase its reported earnings. When the pace of acquisitions slowed, it added new strategies to disguise a decline in its revenues. In 2002, however, the scheme collapsed.

On June 25, 2002, WorldCom announced that it had improperly treated more than $3.8 billion in ordinary costs as capital expenditures in violation of generally accepted accounting principles ("GAAP") and would have to restate its publicly-reported financial results for 2001 and the first quarter of 2002. WorldCom later announced that its reported earnings for 1999 through the first quarter of 2002 had been affected by manipulation of various reserves and had overstated earnings by

$3.3 billion. WorldCom also announced that it would likely write off goodwill of $50 billion. The impact of those disclosures on the price of WorldCom shares and the value of its notes was catastrophic. Its common stock dropped from a high of $65 per share to pennies.

## A. Accounting Irregularities

WorldCom manipulated its books in two main areas: (1) its charges to income and classification of assets in connection with acquisitions, and (2) its accounting for "line" costs. In each of these areas, WorldCom failed to follow GAAP, and instead freely reworked its numbers in order to meet marketplace earnings projections.

### 1. Acquisitions

Part of the acquisition process involves identifying costs incurred in connection with each merger and taking corresponding charges to income. WorldCom improperly recorded expenses at the time of the acquisition that should not have been included. The effect was to inflate earnings in later periods when the expenses were actually incurred and should have been recorded.

In addition, at the time of acquisitions, WorldCom took overly large and unjustified charges to income, creating inflated merger reserves that it would later tap into when it needed to do so to boost reported earnings. Enormous charges were typical of the mergers and acquisitions in the 1990s and "WorldCom and its senior officers knew that Wall Street would not be concerned with the size of the charges."

WorldCom used the acquisition of MCI in particular to manipulate its earnings statements by improperly classifying the assets it obtained. WorldCom understated the book value of MCI's property, plant and equipment assets and overstated the value of the goodwill acquired. By classi-

fying MCI's value in terms of a slowly depreciating asset like goodwill rather than hard assets, which depreciate in one-tenth of the time, WorldCom improperly inflated its earnings during the years immediately following the MCI acquisition.

### 2. Line Costs

With a decline in its revenue, and further prompted by the failure of its attempt to acquire Sprint, WorldCom began a new accounting fraud, no later than 2000, in connection with its single largest operating expense: line costs. WorldCom had entered into long-term lease agreements with other telecommunications companies for the use of their networks. Pursuant to these leases, WorldCom was obligated to make fixed monthly payments for the use of the networks, or lines, regardless of whether WorldCom or its customers in fact used the leased lines. When demand did not grow as WorldCom had hoped, the company found itself with substantial fixed line costs for networks that were not generating any income.

Under GAAP, line costs must be reported as an expense. In October 2000, and without any justification in fact or under GAAP, Sullivan instructed Yates, Myers and others in WorldCom's accounting department to make journal entries crediting WorldCom's line cost expense accounts, and instructed Myers and others to make corresponding reductions in various reserve accounts so that the general ledger would balance.

In 2001, WorldCom changed its method for disguising the impact of line costs on its revenues. Sullivan directed that line costs simply be reclassified as capital expenditures that could be depreciated over time. The effect of the reclassification was to inflate WorldCom's reported earnings.

## B. The Defendants

### Bernard J. Ebbers

Ebbers's position in the company, his statements, his close relationship with Sullivan, his reputation for acting as a "hands on" manager, the size of the fraud, and certain decisions he made regarding WorldCom's internal audit department provide evidence that Ebbers was aware of WorldCom's fraudulent accounting practices. Key allegations include the following.

WorldCom's General Counsel has admitted that Sullivan informed Ebbers that hundreds of millions of dollars had been transferred into capital expenditure accounts. In 2000, Ebbers assured the assembled senior staff that the company "won't have to worry about earnings for years" because it could use cash reserves to boost revenue if necessary. As reflected in e-mail correspondence, at a dinner attended by Ebbers, Sullivan, and WorldCom employees Ron Beaumont and Tom Bosley, Bosley agreed to do whatever was necessary to get WorldCom's "margins back in line" before the financial results for the fourth quarter of 2000 were disclosed. In March 2002, Ebbers sought to curtail the work of WorldCom's internal auditors by cutting the department's budget in half. Ebbers repeatedly represented to the public that he was familiar with WorldCom's accounting policies and practices, that they were reliable, and that they complied with SEC requirements. On February 7, 2002, only a month before the SEC began its investigation of WorldCom, Ebbers stated in an earnings conference call with analysts that "we stand by our accounting."

Ebbers's personal financial situation provided a strong motive for materially misstating WorldCom's earnings. Ebbers had significant personal loans secured by WorldCom stock. In the fall of 2000, as WorldCom's stock price fell, Ebbers faced margin calls on those loans. That fall, after government regulators blocked WorldCom's proposed merger with Sprint, Ebbers sold about $70 million worth of WorldCom stock. The sale was structured as a forward sales contract in which Ebbers received a guaranteed price of approximately $70 million for stock that was to be exchanged in April 2002. By selling through the forward contract, Ebbers disguised the obvious implications of the sale of a substantial amount of WorldCom stock by its CEO, but received approximately $13 million less than he would have had he sold the stock at that time. Ebbers had planned to sell more of his WorldCom holdings earlier that fall in order to cover margin calls but, fearing that a stock sale by the CEO would adversely affect the company's share price, WorldCom loaned Ebbers sufficient funds to cover the calls. This pattern repeated itself in November and December 2000. WorldCom also loaned Ebbers funds to repay certain personal debt. Ultimately, over the course of 2000 and 2001, WorldCom loaned Ebbers approximately $400 million to cover margin calls on personal loans secured by WorldCom stock. During the class period, Ebbers had approximately $900 million in personal loans secured by WorldCom stock. WorldCom's board and senior management were aware that Ebbers faced continuous pressure from margin calls on loans secured by WorldCom stock. Further allegations regarding Ebbers are discussed below in connection with the SSB Defendants.

### Director Defendants

All or most of the Director Defendants signed each of the following documents filed by WorldCom with the SEC: the 1999, 2000, and 2001 Forms 10–K, May 2000 and May 2001 Registration Statements, and the registration statements filed in connection with WorldCom's acqui-

sition of SkyTel Communications, Inc. in 1999 and of Intermedia Communications, Inc. in 2001.[7]

The Complaint alleges that the Director Defendants participated directly and indirectly in the preparation or issuance of public statements in violation of Section 10(b). By virtue of their positions on the WorldCom Board of Directors and, in some instances, its Audit and Compensation Committees, the Director Defendants were able to and did control the false public statements that constitute the substance of the allegations, are presumed to have had the power to control the transactions that gave rise to the violations, and did have the power to direct the management and activities of WorldCom and its employees, including the power to cause WorldCom to engage in the violations.

Audit committees play a critical role in monitoring corporate management and a corporation's auditor.[8] WorldCom's SEC filings represented that the WorldCom Audit Committee reviewed its financial statements, communicated with World-Com's independent accountants, and reviewed internal accounting controls. Despite these representations, WorldCom's accounting controls were "virtually non-existent." The size of WorldCom's restatement alone demonstrates that the Audit Committee Defendants either knew of the accounting irregularities or recklessly disregarded information which would have led them to discover the fraud. The Audit

Committee had direct notice that World-Com's internal controls were deficient. Fraudulent billing practices discovered in a Pentagon City, Virginia WorldCom office in June 2001, resulted in the overpayment of almost $1 million in sales commissions.

The Complaint includes allegations that are specific to individual Director Defendants. On January 30, 2002, two weeks before WorldCom took a massive write-off of goodwill, Galesi sold 63% of his World-Com holdings in return for $27 million. As Chair of the Compensation Committee, Kellett played a key role in securing the Company's $400 million in loans for Ebbers. In exchange, the Complaint alleges that WorldCom leased a jet to Kellett for one dollar per month. Kellett also received from SSB 31,550 shares in "hot" initial public offerings ("IPOs"). In November 2000, Kellett entered a forward sale of sixty-seven percent of his World-Com holdings in exchange for $53 million to be paid in November 2003. While this sale was for less than the shares were worth on the open market, this contract was a hedge against the impending collapse in the share price and avoided the negative market reaction to an insider's sale of this magnitude. Kellett sold fifty-percent of his remaining WorldCom holdings in December 2001, for $11.9 million.

**Underwriter Defendants**

As underwriters of the 2000 and 2001 Offerings the Underwriter Defendants

---

7. Porter is alleged to have signed only the 2000 and 2001 Registration Statements and the SkyTel registration statements. Tucker is alleged to have signed only the 1999 Form 10–K, the 2000 Registration Statement, and the SkyTel registration statement. Alexander is alleged to have signed all of the listed filings with the exception of the 2001 Form 10–K and, possibly, the SkyTel registration statement. The Complaint is inconsistent with respect to Alexander's signing of the SkyTel registration statement.

8. The report of a Blue Ribbon Committee of the New York Stock Exchange explains that audit committees' oversight responsibilities include "ensuring that quality accounting policies, internal controls, and independent and objective auditors are in place to deter fraud, anticipat[ing] financial risks and promot[ing] accurate, high quality and timely disclosure of financial and other material information...."

were responsible for the contents and dissemination of the Registration Statements, which contained material misrepresentations and upon which plaintiffs relied in purchasing WorldCom securities. Although the Underwriter Defendants were aware that the value of the goodwill identified in WorldCom's books was impaired, they did not reflect that fact in the Registration Statements. In order to assess WorldCom's anticipated sources of revenue in preparation for the Offerings, the Underwriter Defendants should have examined WorldCom's infrastructure; had they done so, they would have discovered WorldCom's improper capitalization of line costs. By comparing WorldCom's budgeted capital expenditures to its actual capital expenditures or its revenues to its revenue producing capital assets, and by investigating the authorization—or lack thereof—for the capital accounting, the Underwriter Defendants also could have discovered the accounting fraud. Numerous other "red flags" should have alerted the Underwriter Defendants to WorldCom's fraudulent accounting practices and should have been investigated by them, including WorldCom's interest in using unusually aggressive accounting practices, commitment to aggressive and unrealistic forecasts, lack of effective Board oversight over WorldCom executives, inadequate monitoring of significant controls, failure to make certain corrections in a timely manner, market saturation and declining margins, and tendency to base material amounts of assets, liabilities, revenues, and expenses on estimates involving unusually subjective judgments or uncertainties. Given SSB's significant and unusual relationship with WorldCom and its executives, the remaining Underwriter Defendants should have been particularly alert in conducting their own due diligence prior to the Offerings.

## SSB, Grubman, and Citigroup

In addition to WorldCom's own fraudulent representations, investors were misled by material misrepresentations and omissions by Jack Grubman and SSB in SSB's analyst reports and by SSB in WorldCom's Registration Statements. The SSB Defendants' analyst reports and the Registration Statements issued in connection with the 2000 and 2001 Offerings were false and misleading not only because they misrepresented WorldCom's financial condition, but also because they failed to disclose key information regarding the nature and extent of an illicit *quid pro quo* arrangement that existed between the SSB Defendants and WorldCom.[9] Had that self-serving arrangement been adequately disclosed, it would have been apparent that Grubman's positive reports about WorldCom and recommendations to buy WorldCom were not reliable advice from an independent analyst and trustworthy brokerage house. The illegal *quid pro quo* arrangement was that the SSB Defendants would issue positive analyst reports about WorldCom, provide WorldCom senior executives with valuable IPO shares, and loan Ebbers hundreds of millions of dollars, in exchange for WorldCom's investment banking business and the substantial revenue and personal compensation that that business generated for the SSB Defendants.

Throughout the class period, SSB issued analyst reports authored by Grubman that touted WorldCom's value and that vigorously encouraged investors to buy the purportedly undervalued stock. These reports were issued despite the knowledge of SSB's management that the integrity and objectivity of its research department was

---

**9.** The similarity between the allegations regarding misrepresentations and omissions in the analyst reports and the Registration Statements is discussed in this Court's opinion in *In re WorldCom, Inc. Sec. Litig.,* 2003 WL 1563412, at *3–5.

compromised by the department's decision to serve the needs of the firm's investment bankers at the expense of providing investors with independent analysis. In February 2001, the global head of SSB's retail stock selling division told the head of SSB's Global Equity Research Management that SSB's "research was basically worthless."

Far from being an independent analyst, Grubman's compensation was directly tied to SSB's investment banking business. In 2001 alone, Grubman claimed compensation for his involvement in ninety-seven investment banking transactions which together generated $166 million in revenues. Grubman even attended two WorldCom board meetings, meetings concerning the acquisition of MCI and of Sprint. When he attended Ebbers's wedding, Grubman charged the trip to the investment banking department. Grubman's importance to SSB is reflected in his compensation. Between 1998 and 2002, Grubman made about $20 million each year. When Grubman resigned from SSB in August 2002, he received a severance package of $32 million plus forgiveness of a $19 million loan.

There are several examples of how Grubman's research reports were compromised by his close ties to the investment banking department. Grubman has admitted that he had refrained from downgrading his ratings of certain stocks due to pressure from his firm's investment bankers, and gave several telecommunications companies higher ratings than he believed the companies deserved. Grubman's reports on WorldCom itself are evidence that he wrote them in bad faith. Grubman repeatedly issued positive reports and "buy" ratings in connection with announcements by WorldCom that were expected to cause its stock price to fall. Grubman maintained a "buy" rating until April 21, 2002, by which time WorldCom stock was trading at only $4 per share. Just before the 2000 Offering for which SSB served as the co-lead underwriter, Grubman began to use a new "cash earnings" model for evaluating WorldCom. Until early 2000, Grubman had assessed WorldCom and other telecommunications companies using a "discounted free cash flow" model. When use of that model threatened to expose WorldCom's financial deterioration, Grubman adopted a new model designed to omit the influence of capital expenditures—a key element of WorldCom's accounting fraud. Over the next two years, Grubman did not apply the cash earnings model to any of the other telecommunications companies on which he reported.

Grubman, Ebbers, SSB and WorldCom thrived through their symbiotic relationship. During this same time, Grubman was SSB's top telecommunications analyst and one of the most powerful men on Wall Street. It was said that he could make or break any telecommunications stock. Grubman's positive research reports played a significant role in assuring that the SSB Defendants would retain WorldCom's lucrative investment banking business. WorldCom was an extremely desirable client because it engaged in so many acquisitions, generating significant banking business. Since premier investment banks charge similar underwriting fees, Grubman's positive analyst reports succeeded in giving SSB's investment bankers an advantage over their competitors. WorldCom selected SSB to serve as its lead investment bank in every major acquisition and debt offering between 1997 and 2001, twenty-three deals in all. In compensation, SSB received $107 million. The deals included WorldCom's $40 billion merger with MCI, the failed $129 billion Sprint merger, and, as lead or co-lead underwriter, the 2000 and 2001 Offerings.

On WorldCom's side, Ebbers, Sullivan and Kellett received valuable allocations of

shares in various "hot" IPOs from SSB. SSB gave significant percentages of its total available retail allocation from "hot" IPOs to Ebbers on multiple occasions. Ebbers alone received allocations in at least twenty-one hot IPOs, from which he derived profits of $11.5 million. In a letter to the United States House of Representatives Committee on Financial Services, SSB admitted that "some allocations to corporate officers and directors ... were sufficiently large as to raise questions about the appearance of conflicts."

Ebbers also received hundreds of millions of dollars in loans from The Travelers Insurance Company ("Travelers"), a Citigroup subsidiary and a former parent of SSB. These loans were never publicly disclosed. They were effectively concealed because they were made to Joshua Timberlands LLC, an entity controlled by Ebbers, but held by another entity whose connection with Ebbers was also obscured. The loans were secured in part by WorldCom stock, a fact that gave Citigroup an additional incentive to prop up the price of WorldCom stock to protect its investment.

## III. Legal Standards

### Federal Rules of Civil Procedure

The defendants move to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6), Fed.R.Civ.P., and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u4–b. Rule 8, Fed.R.Civ.P., is also relevant to portions of these motions.

### Rule 8

■ The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2), Fed.R.Civ.P. Pleadings are to give "fair notice" of a claim in order to enable the opposing party to answer and prepare for trial, and to identify the nature of the case. *Simmons v.*

*Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988). "Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions." *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

### Rule 12(b)(6)

To dismiss an action pursuant to Rule 12(b)(6), a court must determine that "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997) (citations omitted). In construing the complaint, the court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Id.* "Given the Federal Rules' simplified standard for pleading, a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz,* 534 U.S. at 514, 122 S.Ct. 992 (citation omitted).

■ Although the court's focus should be on the pleadings, it may also consider *any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.* *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citations omitted); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991). The court need not credit general conclusory allegations that "are belied by more specific allega-

tions of the complaint." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir.1995).

### Rule 9(b)

 Rule 9(b) requires allegations of fraud, including securities fraud, to be stated with particularity. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000). Under Rule 9(b), "[m]alice, intent, knowledge and other conditions of mind of a person may be averred generally." Rule 9(b), Fed.R.Civ.P.; *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001). To comply with the requirements of Rule 9(b), an allegation of fraud must specify: "(1) those statements the plaintiff thinks were fraudulent, (2) the speaker, (3) where and when they were made, and (4) why plaintiff believes the statements fraudulent." *Koehler v. Bank of Bermuda (New York) Ltd.*, 209 F.3d 130, 136 (2d Cir.2000).

### *The Securities Act of 1933*

### Section 11

"The Securities Act of 1933 was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (citation omitted). Section 11 of the Securities Act provides that any signer, director of the issuer, preparing or certifying accountant,

or underwriter may be liable if *"any part of the registration statement,* when such part became effective, *contained an untrue statement of a material fact or omitted to state a material fact* required to be stated therein or necessary to make the statements therein not misleading...." 15 U.S.C. § 77k(a) (emphasis supplied).[10] "The section was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

"[A]ny person acquiring a security issued pursuant to a materially false registration statement" has a cause of action under Section 11 "unless the purchaser knew about the false statement at the time of acquisition." *Demaria v. Andersen*, 318 F.3d 170, 175 (2d Cir.2003) (citation omitted). Purchasers have standing to sue whether they purchased at the time of the initial public offering or in the aftermarket, and those who purchased within twelve months after the issuance of the registration statement need not prove reliance in order to recover. *Id.* at 176; 15 U.S.C. § 77k(a).

 Allegations that "material facts have been omitted" from a registration statement or "presented in such a way as to obscure or distort their significance" are sufficient to state a claim for violation of Section 11. *I. Meyer Pincus & Assocs.,*

---

**10.** Section 11 states in pertinent part:

[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security ... may sue—

(1) every person who signed the registration statement;

(2) every person who was a director of ... the issuer ...

(4) every accountant ... who has with his consent been named as having prepared or certified any part of the registration statement ...

(5) every underwriter with respect to such security.

15 U.S.C. § 77k.

*P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir.1991) (citation omitted). Material facts may "include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 732 (2d Cir.1987) (citation omitted). The "central inquiry" in determining whether a statement is misleading under Section 11 is "whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the investment." *I. Meyer Pincus,* 936 F.2d at 761 (citation omitted); *see also Demaria,* 318 F.3d at 180.

Section 11(e), 15 U.S.C. § 77k(e), provides an affirmative defense for defendants who can prove that the loss in the value of a security is due to something other than the alleged misrepresentation or omission on which the Section 11 claim is premised. It states:

> That if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.

15 U.S.C. § 77k(e). Although "not insurmountable," defendants' burden in establishing this defense is heavy since "the risk of uncertainty" is allocated to defendants. *Akerman v. Oryx Commun., Inc.*, 810 F.2d 336, 341 (2d Cir.1987).

**Section 12**

Section 12(a)(2) of the Securities Act, known prior to the 1995 PSLRA amend-ments as Section 12(2), allows a purchaser of a security to bring a private action against a seller that "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading." 15 U.S.C. § 77l(a)(2). The section entitles the buyer

> to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

*Id.; Commercial Union Assur. Co. v. Milken,* 17 F.3d 608, 615 (2d Cir.1994); *see also Randall v. Loftsgaarden,* 478 U.S. 647, 655, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986) (" § 12(2) prescribes the remedy of rescission except where the plaintiff no longer owns the security.").

■ Section 12 turns on status, not scienter: it imposes liability without requiring "proof of either fraud or reliance." *Gustafson v. Alloyd Co.,* 513 U.S. 561, 582, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). Instead, plaintiff must show "only some causal connection between the alleged communication and the sale, even if not decisive." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 361 (2d Cir.1992) (citation omitted).

The PSLRA added an affirmative defense modeled after Section 11 of the Securities Act. *Goldkrantz v. Griffin,* No. 97 Civ. 9075(DLC), 1999 WL 191540, at *6 (S.D.N.Y. Apr. 6, 1999), *aff'd,* 201 F.3d 431 (2d Cir.1999). The statute prohibits recovery to the extent that

> the person who offered or sold such security proves that any portion or all of the amount recoverable . . . represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communi-

cation, with respect to which the liability of that person is asserted....

15 U.S.C. § 77l(b).

■ Defendants may be liable under Section 12(a)(2) either for selling a security or for soliciting its purchase. First, Section 12 creates a cause of action against sellers who "passed title, or other interest in the security, to the buyer for value." *Pinter v. Dahl,* 486 U.S. 622, 642, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988); *see also Wilson v. Saintine Exploration & Drilling Corp.,* 872 F.2d 1124, 1126 (2d Cir.1989) (applying *Pinter's* § 12(1) analysis to what is now § 12(a)(2)); *Capri v. Murphy,* 856 F.2d 473, 478 (2d Cir.1988) (same). To be liable as a seller, the defendant must be the "buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Pinter,* 486 U.S. at 644 n. 21, 108 S.Ct. 2063.

■ Second, persons who are not in privity with the plaintiff may be liable if they "successfully solicit[ed] the purchase, motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner." *Id.* at 647, 108 S.Ct. 2063; *see also Wilson,* 872 F.2d at 1126; *Commercial Union Assurance Co.,* 17 F.3d at 616. In finding that Section 12 included liability for solicitation, the Supreme Court observed that, "[t]he solicitation of a buyer is perhaps the most critical stage of the selling transaction .... [and] the stage at which an investor is most likely to be injured." *Pinter,* 486 U.S. at 646, 108 S.Ct. 2063.

■ Underwriters may be liable as sellers under Section 12(a)(2). In a firm commitment underwriting, "the underwriter agrees to purchase an agreed upon percentage of the offering irrespective of whether the securities can be sold in the public market; therefore, the underwriter bears the risk if the offering is undersub-scribed." *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 701 (2d Cir.1994). The underwriter is thus the owner of any unsold shares and can be liable as a "seller" for direct sales to the public for purposes of Section 12(a)(2). *In re American Bank Note Holographics, Inc. Sec. Litig.,* 93 F.Supp.2d 424, 438–39 (S.D.N.Y.2000); *cf. In re Deutsche Telekom AG Sec. Litig.,* No. 00 Civ. 9475(SHS), 2002 WL 244597, at *4–5 (S.D.N.Y. Feb. 20, 2002) (issuer not liable as seller under § 12(a)(2) because it had transferred title to underwriters in accordance with a firm commitment underwriting).

## Section 15

Section 15 of the Securities Act attaches liability to "[e]very person who, by or through stock ownership, agency, or otherwise, ... controls any person liable" under Sections 11 or 12 of the Securities Act. 15 U.S.C. § 77o. To state a violation of Section 15, a plaintiff must plead (1) an underlying primary violation of Sections 11 or 12 by the controlled person; and (2) the defendant's control over the primary violator. *In re Deutsche Telekom,* 2002 WL 244597, at *6 (noting intra-circuit split). Section 15 provides an affirmative defense. It exempts from liability a person who "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o.

### *The Securities Exchange Act of 1934*

## Section 10(b) and Rule 10b–5

The fundamental purpose of the federal securities laws "was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237

(1963). Section 10(b) of the Exchange Act in particular is designed to protect investors by serving as a "catchall provision" which creates a cause of action for manipulative practices by defendants acting in bad faith. *Hochfelder*, 425 U.S. at 206, 96 S.Ct. 1375.

Section 10(b) provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5, the parallel regulation, describes what constitutes a manipulative or deceptive device and provides that it is unlawful for any person, directly or indirectly:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5; *see also Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir.1999). Plaintiffs' claims arise under Section 10(b) and Rule 10b–5 of the Exchange Act.

To state a cause of action under Section 10(b) and Rule 10b–5 a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff." *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir.2003) (quoting *Ganino*, 228 F.3d at 161); *see also Kalnit*, 264 F.3d at 138 (citation omitted). Section 10(b) claims sound in fraud, and must satisfy the pleading requirements of Rule 9(b) and the PSLRA. *See In re Scholastic Corp.*, 252 F.3d 63, 69–70 (2d Cir.2001).

### 1. Statements and omissions

A statement is material where there is a substantial likelihood that a reasonable person would consider it important when deciding whether to buy or sell securities. *Halperin v. EBankerUsa.com, Inc.*, 295 F.3d 352, 357 (2d Cir.2002). Statements of opinion and projections are actionable if they are "worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *Int'l Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir.1998) (citation omitted). For each statement or omission, the court must determine whether "defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Halperin*, 295 F.3d at 357; *see also Basic v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 267–68 (2d Cir.1993).

The "bespeaks caution" doctrine instructs courts to consider the "total mix" of information available to a reasonable

investor to determine whether cautionary language in a document would have prevented an investor from being misled. *Halperin*, 295 F.3d at 357. To be effective, the cautionary language must warn of or directly relate to the risk that brought about the plaintiff's loss. *Id.* at 359; *DeMaria*, 318 F.3d at 181–82. Conversely, misrepresentations will be immaterial as a matter of law where "it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same" document. *Halperin*, 295 F.3d at 357. A complaint fails to state a claim only if "*no reasonable investor* could have been misled about the nature of the risk." *Id.* at 359 (emphasis in original).

The PSLRA added a statutory "safe harbor" for forward-looking information. It applies only to statements accompanied by meaningful cautionary language or which are not proven to have been made with actual knowledge that they were false or misleading. *See In re Nortel Networks Corp. Sec. Litig.*, 238 F.Supp.2d 613, 629 (S.D.N.Y.2003); *see* 15 U.S.C. §§ 77z–2(c)(2)(A)(i) and 2(c)(1)(B)(1), 78u–5(c)(1)(A)(i) and 5(c)(1)(B)(2) (safe-harbor provisions).

### 2. Scienter

"The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b–5, that the plaintiff must allege is an intent to deceive, manipulate or defraud." *Kalnit*, 264 F.3d at 138 (citation omitted). In the Second Circuit, plaintiffs alleging securities fraud have long been required to state with particularity "facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir.1996).

When Congress passed the PSLRA it required that

[i]n any private action arising under this chapter in which the plaintiff may recover money damages *only on proof that the defendant acted with a particular state of mind*, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

15 U.S.C. § 78u–4(b)(2) (emphasis supplied). The PSLRA raised the nationwide pleading standard for securities fraud but did not alter the level of pleading previously required by the Second Circuit. *Kalnit*, 264 F.3d at 138; *Ganino*, 228 F.3d at 170; *Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir.2000).

The Second Circuit standard provides that "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent. The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito*, 47 F.3d at 52 (citation omitted); *see also Kalnit*, 264 F.3d at 138; *Rothman*, 220 F.3d at 90.

The Second Circuit also has noted, however, that because Congress did not mention the pleading of "motive and opportunity" as a means to establish the "strong inference" of scienter, courts "need not be wedded to these concepts in articulating the prevailing standard." *Novak*, 216 F.3d at 310. Nonetheless, the Second Circuit has continued to rely on facts demonstrating that a defendant had both the motive and the opportunity to commit fraud in evaluating the adequacy of scienter allegations. *See, e.g., In re Scholastic Corp.*, 252

F.3d at 74–76. It has identified four types of allegations that may support a strong inference of scienter:

> [W]here the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

*Novak,* 216 F.3d ·at 311 (citation omitted).

### (a) Motive and opportunity

"Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Novak,* 216 F.3d at 307 (citation omitted).

■ General allegations that identify the same motives "possessed by virtually all corporate insiders" are not sufficient to create a strong inference of fraudulent intent. *Id.* Plaintiffs cannot, for example, rest solely on allegations that defendants sought to prolong their employment at certain positions, *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir. 1994), that defendants owned stock, *id.* at 1131, or that defendants sought to retain a high bond or credit rating for the company, *San Leandro,* 75 F.3d at 814. *See Novak,* 216 F.3d at 307–08.

■ Insider sales may serve as evidence of motive, but the plaintiff must allege that any such sales were unusual in some way. For example, the insider trading may be extensive. *See Novak,* 216 F.3d at 308. If one director engaged in insider sales, the court may consider whether other directors also sold or held their shares during the relevant period. *Acito,* 47 F.3d at 54. The amount of profit and the percentage of the defendant's

holdings that were sold are also relevant. *In re Scholastic Corp.,* 252 F.3d at 63, 74–75; *Rothman,* 220 F.3d at 94–95; *Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 85 (2d Cir.1999).

### (b) Conscious misbehavior or recklessness

■ The pleading standard also will be satisfied if plaintiffs allege facts showing that the defendant's conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman,* 220 F.3d at 90 (citation omitted); *Kalnit,* 264 F.3d at 142. Pleadings have been found sufficient when they have "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Kalnit,* 264 F.3d at 142 (citation omitted). If plaintiffs rely on allegations that the defendants had access to facts contradicting their public statements, plaintiffs must "specifically identify the reports or statements containing this information." *Novak,* 216 F.3d at 309 (citation omitted). Allegations of recklessness have also been sufficient where the allegations demonstrate that defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Id.* at 308. A violation of GAAP, however, standing alone, is insufficient. *Id.* at 309.

### 3. Causation

Another element of a Section 10(b) claim is that "plaintiff's reliance on defendant's action caused plaintiff injury." *Press,* 166

F.3d at 534 (citation omitted). "It is settled that causation under federal securities laws is two-pronged: a plaintiff must allege both transaction causation, *i.e.* that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.*, that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001); *see also Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 186–87 (2d Cir.2001); *Grace v. Rosenstock,* 228 F.3d 40, 46 (2d Cir.2000). Transaction and loss causation are alleged when plaintiffs aver "both that they would not have entered the transaction but for the misrepresentations *and* that the defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of transaction." *Suez Equity,* 250 F.3d at 97–98 (emphasis in original).

■ Given the difficulty of proving direct reliance in the complex world of the modern securities markets, plaintiffs may rely on the "fraud-on-the-market" theory. Under the fraud-on-the-market theory, plaintiffs need not allege that they actually encountered the misrepresentation. Instead, they are presumed to have relied on the market to have "perform[ed] a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price." *Basic,* 485 U.S. at 244, 108 S.Ct. 978 (citation omitted); *see DiRienzo v. Philip Services Corp.,* 294 F.3d 21, 33 (2d Cir.2002). Although the presumption is not absolute, at the pleading stage it satisfies plaintiffs' burden of alleging transaction causation. *See Basic,* 485 U.S. at 247, 108 S.Ct. 978; *In re Ames Dept.*

*Stores Inc. Stock Litig.,* 991 F.2d 953, 967 (2d Cir.1993).

■ Loss causation is akin to the concept of "proximate cause" in tort law, "meaning that in order for the plaintiff to recover it must prove the damages it suffered were a foreseeable consequence of the misrepresentation." *Suez Equity,* 250 F.3d at 96 (citation omitted); *see also Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.,* 801 F.2d 13, 21 (2d Cir.1986). The Second Circuit has noted that "[a] foreseeability finding turns on fairness, policy, and 'a rough sense of justice.'" *AUSA Life Ins. Co. v. Ernst & Young,* 206 F.3d 202, 217 (2d Cir.2000) (quoting *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 352, 162 N.E. 99 (1928)). Determining whether a loss was a foreseeable consequence of a particular defendant's actions is, ultimately, a public policy question, which asks how far back along the causal chain should liability for the plaintiffs' losses extend. *Suez Equity,* 250 F.3d at 96; *AUSA Life Ins. Co.,* 206 F.3d at 210. In assessing loss causation allegations, courts ask "was the damage complained of a foreseeable result of the plaintiff's reliance on the fraudulent misrepresentation?" *Weiss v. Wittcoff,* 966 F.2d 109, 111 (2d Cir.1992) (citation omitted). If the allegations support an inference that a defendant could reasonably have foreseen that the misrepresentation pertained to an issue that would cause the eventual damage, loss causation will be considered adequately pleaded. *Suez Equity,* 250 F.3d at 98; *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir. 1992).

### Section 20(a)

Section 20(a) of the Exchange Act creates a cause of action against defendants alleged to have been "control persons" of

those engaged in the primary securities fraud. The section provides:

> *Every person who, directly or indirectly, controls any person liable under any provision of this chapter* or of any rule or regulation thereunder *shall also be liable jointly and severally* with and to the same extent as such controlled person to any person to whom such controlled person is liable, *unless the controlling person acted in good faith* and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). In construing a statute, the starting point must be "the words of the text." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir.2003). The statutory language identifies two components to a control person claim: (1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant. It also provides for an affirmative defense of good faith.

Other courts in this District have thoughtfully discussed the lack of clarity in the law concerning Section 20(a), and this Court will not replicate their careful efforts. *See, e.g., Initial Public Offering Sec. Litig.*, 241 F.Supp.2d 281, 392–97 (S.D.N.Y.2003); *In re Livent Sec. Litig.*, 148 F.Supp.2d 331, 351–55 (S.D.N.Y.2001); *Mishkin v. Ageloff*, No. 97 Civ. 2690(LAP), 1998 WL 651065, at *21–26 (S.D.N.Y. Sept. 23, 1998). Much of the confusion concerns the phrase "culpable participant," a phrase which appears to have first arisen in Second Circuit jurisprudence in a discussion of the congressional intent behind the passage of Section 20(a). *See Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir.1973).

The principle issues regarding this phrase concern its role at the pleading stage and its content. Specifically, lower courts have tried to discern (1) whether it is necessary to plead culpable participation in addition to the other two components of a Section 20(a) claim, and (2) even if there is no burden to plead culpable participation but only a burden on a plaintiff to present prima facie evidence of culpable participation at trial, whether proof of culpable participation entails proof that the control person acted with a particular state of mind. Under the PSLRA, the requirement that the plaintiff prove a culpable state of mind at any point in the proceedings requires compliance with the PSLRA's heightened pleading standard. Pursuant to the PSLRA, whenever recovery of damages requires "proof that the defendant acted with a particular state of mind, the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

A review of the Second Circuit's opinions in which the phrase "culpable participation" is used in a discussion of Section 20(a) indicates that the term is most frequently used in the context of describing the burden placed on the plaintiff at trial to present prima facie evidence of culpable participation, a burden which if met, operates to shift the burden to the defendant to present evidence of good faith.[11] *See, e.g., SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir.1996). This is not, however, the sole context in which the phrase is used. In *Suez Equity*, 250 F.3d 87, for example, culpable participation appears as

---

**11.** There is another federal statutory scheme that provides an analogy. In Title VII jurisprudence, a plaintiff must present prima facie evidence of discrimination at trial in order to shift the burden to the defendant to provide a non-discriminatory reason for the challenged job action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). There is no requirement, however, that the elements of the prima facie case be pleaded in a Title VII complaint. *Swierkiewicz*, 534 U.S. at 511, 122 S.Ct. 992.

a pleading requirement. *Id.* at 101; *see also In re Scholastic Corp.*, 252 F.3d at 77. In either context, however, it does not appear that there is any requirement that the plaintiff plead or prove a culpable state of mind to allege or establish culpable participation.

A few examples will suffice to illustrate that there is no required state of mind for a defendant's culpable participation in a Section 20(a) offense. In *Suez Equity*, 250 F.3d 87, a complaint that alleged (1) that the person who had violated the securities laws was an officer of the defendant bank, and (2) that that person had primary responsibility for the dealings of the bank with the business whose securities were at the center of the lawsuit, was sufficient to allege a Section 20(a) claim against the bank. *Id.* at 101. In *Marbury Mgt. v. Kohn*, 629 F.2d 705 (2d Cir.1980), the Court's detailed description of the evidence at trial that sufficed to establish Section 20(a) liability for the employer did not include any reference to evidence of scienter. *Id.* at 711–12. Specifically, the evidence "did not show that [the employer] intended to deceive plaintiffs, or knew of [the] violations, or provided substantial assistance to [the wrongdoer] in violating the securities law, but at most showed only negligence on [the employer's] part." *Id.* at 710. Despite the lack of evidence of knowledge or intent, the Court of Appeals reversed and remanded the Section 20(a) claim because the trial court had failed to consider the employer's liability under Section 20(a). *Id.* at 711, 716. Similarly, most other Circuit Courts of Appeals, including those that have a culpable participant test, have not required a plaintiff to plead, or, in establishing liability to prove, a defendant's culpable state of mind in connection with a Section 20(a) claim. *See, e.g., Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir.1998); *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir.1996); *Harrison v. Dean Witter Reyn-olds, Inc.*, 79 F.3d 609, 614 (7th Cir.1996); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir.1990). *But see, e.g., Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 885 (3d Cir.1975).

From this review it appears that a plaintiff must plead only the existence of a primary violation by a controlled person and the direct or indirect control of the primary violator by the defendant in order to state a claim under Section 20(a). In addition, this pleading requirement is governed by Rule 8, Fed.R.Civ.P. *See Swier-kiewicz*, 534 U.S. at 513, 122 S.Ct. 992; *see also In re IPO Sec. Litig.*, 241 F.Supp.2d at 396.

The concept of culpable participation describes that degree of control which is sufficient to render a person liable under Section 20(a). At the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard. At trial, the degree of control will require the plaintiff to present prima facie evidence of sufficient control to support liability. Although previous opinions of this Court have imposed a greater burden on plaintiffs at the pleading stage, this Court now finds that plaintiffs need not meet the PSLRA's heightened pleading standard in alleging a violation of Section 20(a), or separately allege culpable participation. *Cf. In re IPO Sec. Litig.*, 241 F.Supp.2d at 396 n. 186.

If the plaintiff has adequately pleaded a Section 10(b) claim, the first or primary violation element of a Section 20(a) claim is sufficiently pled. *In re Scholastic Corp.*, 252 F.3d at 77–78. Control is defined in 17 C.F.R. § 240.12b–2 as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *See also First Jersey*, 101 F.3d at 1472–73 (adopting this standard for Section 20(a) claim). A short,

plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required. *See Swierkiewicz,* 534 U.S. at 512, 122 S.Ct. 992; *In re IPO Sec. Litig.,* 241 F.Supp.2d at 352.

## IV. Discussion

### Ebbers

 Ebbers moves to dismiss all claims against him (Counts I, II, VI and VII). Since his motion is principally addressed to Count VI, the Section 10(b) claim, that is the only claim addressed here.[12]

The allegations in the Complaint are sufficient to create a strong inference that Ebbers acted with the requisite scienter. First, the Complaint describes strong circumstantial evidence that Ebbers knew that WorldCom was manipulating its books. The Complaint pleads with particularity information from a wealth of sources that support the inference that Ebbers was fully familiar with WorldCom's true financial state, was actively monitoring its financial condition, and was directly involved in decisions central to the accounting fraud. Although size alone does not necessarily create an inference of scienter, the enormous amounts at stake in the alleged fraud combined with the allegations regarding Ebbers's close relationship with Sullivan, his hands-on management style, and the Complaint's more detailed recitations, create a strong infer-

ence that Ebbers knew that his public statements lauding WorldCom's financial state and SEC filings were not just reckless, but false. *See In re Scholastic Corp.,* 252 F.3d at 73 (size of post-class period special charge supports inference of knowledge); *Rothman,* 220 F.3d at 92 (size of write-off supports claim of fraudulent intent).

The Complaint also adequately alleges scienter in terms of Ebbers's motive and opportunity. Although the same motives "possessed by virtually all corporate insiders" such as protecting the appearance of corporate profits or increasing executive compensation by maintaining a high stock price are insufficient to plead scienter, *Novak,* 216 F.3d at 307, Ebbers's financial incentives were unique and substantial. Ebbers's WorldCom shares provided a crucial underpinning for his complicated personal finances, including stock transactions, the purchase of hundreds of thousands of acres of land for hundreds of millions of dollars, and his considerable personal loans from WorldCom and Citigroup. Ebbers had at least $900 million in loans secured by his WorldCom holdings, including a $400 million loan from WorldCom that was reported to be the largest amount ever loaned by a corporation to one of its officers. In order to avoid or mitigate margin calls from lenders, Ebbers faced substantial pressure to maintain the price of the WorldCom stock that was serving as his collateral. In addition, Ebbers's continued relationship with SSB, from which he derived not only "hot" IPO

---

12. Ebbers adopts the arguments of the Underwriter and Director Defendants in moving to dismiss the Section 11 claim, and adds that Rule 9(b)'s pleading requirements apply to the extent the claim is based on Ebbers's "conspiracy" with SSB. Ebbers does not contest, however, that the Complaint adequately alleges that he made actionable misrepresentations, including by signing WorldCom's Forms 10–K from 1999 to 2001, the registra- tion statements for WorldCom acquisitions between 1999 and 2001, and 2000 and 2001 Registration Statements. Ebbers argues that the Section 20(a) claim requires allegations of culpable participation. For the reasons explained below, in connection with the arguments made by other defendants, Ebbers's motion to dismiss the Sections 11, 15 and 20(a) claims is denied.

shares but also enormous Travelers loans, depended on sustaining WorldCom's acquisition strategy and its stock price. The benefit to Ebbers of maintaining a fraudulently inflated share price was enormous, unusual, personal and concrete enough to satisfy the pleading requirements for scienter.

While Ebbers attempts to argue that each of the many allegations against him is unreliable or an insufficient basis for finding scienter, the attempt is fundamentally flawed.[13] Time and again the sources of the information and the information itself are described in detail, and time and again the information implicates Ebbers in the securities fraud. The allegations in the Complaint are entitled to be taken together to determine if the facts "give rise to a strong inference of fraudulent intent." *Acito*, 47 F.3d at 52. The inference of Ebbers's scienter arises from the combined force of the allegations; the weighing of each piece of evidence and the impeachment of each source must await trial. Moreover, this pleading is not based principally on confidential sources, despite Ebbers's effort to cast it in that light. Even if it were, however, "there is nothing in the case law of this Circuit that requires plaintiffs to reveal confidential sources at the pleading stage." *Novak*, 216 F.3d at 313.

Taken as a whole, the allegations against Ebbers create a strong inference of scienter. His motion to dismiss the Section 10(b) claim is denied.[14]

## Director Defendants

The Audit Committee Defendants (Allen, Areen, Bobbitt and Galesi) as well as Kellett are the only Director Defendants charged with violations of Section 10(b) and each moves to dismiss those claims. All of the Director Defendants are named in and move to dismiss the Sections 15 and 20(a) control person claims.

### Section 10(b) Claim

The Complaint adequately alleges that the Audit Committee Defendants and Kellett made material misrepresentations when they signed WorldCom's Forms 10–K for 1999, 2000, and 2001, as well as the note offering and acquisition registration statements identified above. SEC filings are the quintessential statement on which a reasonable investor may rely and thus are the type of statement that can give rise to a Section 10(b) and Rule 10b–5 action against a defendant who signed them. *See In re Ames Dept. Stores*, 991 F.2d at 972; *Thomson Kernaghan & Co. v. Global Intellicom, Inc.*, Nos. 99 Civ. 3005 & 99 Civ. 3015(DLC), 2000 WL 640653, at *5 (S.D.N.Y. May 17, 2000); *In re JWP Sec. Litig.*, 928 F.Supp. 1239, 1256 (S.D.N.Y.1996). The defendants' novel contention that these documents can only be attributed to WorldCom itself and its management is wrong.

The five Director Defendants who have been named in a Section 10(b) claim argue principally that the Section 10(b) claim must be dismissed because there are insufficient allegations of their individual scien-

---

**13.** Ebbers also refers to the pleading rule contained in paragraph (b)(1) of the PSLRA, 15 U.S.C. § 78u–4(b)(1), that applies to claims in which a plaintiff alleges that an untrue statement of a material fact or a material omission has been made. Among other things, paragraph (b)(1) provides that when an "allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." *Id.* The plaintiffs have scrupulously complied with this requirement and have spelled out in detail the myriad sources of information on which they have relied.

**14.** Ebbers's argument regarding loss causation mirrors the argument made by the SSB Defendants, and is addressed *infra*.

ter. The Complaint relies on allegations of conscious misbehavior or recklessness for each of the four members of the Audit Committee. The Complaint also relies on allegations of motive and opportunity for Defendants Kellett and Galesi.

**Audit Committee: conscious misbehavior or recklessness**

 Plaintiffs contend that the Complaint alleges "strong circumstantial evidence" sufficient to establish that each of the Audit Committee Defendants either engaged in conscious misbehavior or acted recklessly. Plaintiffs argue that because the accounting fraud was so substantial, the Audit Committee members either knew or were reckless in not knowing that WorldCom's SEC filings materially misrepresented the company's financial situation. The magnitude of the alleged fraud is not sufficient, standing alone, to create liability. Plaintiffs also rely on the Audit Committee's general oversight responsibilities and the commitment in the SEC filings that it would review WorldCom's financial statements and internal accounting controls. With one exception, however, the Complaint does not identify what the Audit Committee members would have learned from exercising these responsibilities that would have put them on notice that the SEC filings that they signed were inaccurate. The one exception is that in June 2001 they learned that WorldCom employees in a Virginia office had manufactured phony sales by moving customer accounts from one billing system to another in order to generate almost $1 million in extra commissions. This manipulation is too far removed from the fraud underlying the false statements in the SEC filings to put those defendants on notice of those frauds. The inference that plaintiffs wish the Court to draw—that this Virginia office's scheme revealed that WorldCom as a whole had no internal fraud controls—is not sufficiently supported by the Complaint's allegations.

Finally, plaintiffs also contend that at least four "red flags" put the Audit Committee on notice: (1) questions raised during an earnings conference call on February 7, 2002; (2) the SEC's March 7, 2002 request for documents; (3) the March 11, 2002 Dow Jones Newswire disclosure of the SEC inquiry; and (4) the internal audit in May 2002. Each of the events occurred *after* the last misrepresentation any of the Audit Committee Defendants is alleged to have made and within the last five months leading up to the restatement. The Complaint does not allege that Audit Committee Defendants made any material misstatements after they had received any of these warnings.

The strongest allegations against the Audit Committee members rest on the descriptions of the duties imposed on and assumed by the Audit Committee. Nonetheless, the Complaint falls short of identifying the information which they had a duty to monitor as Audit Committee members and that would have disclosed the fraud had they done so. *See Novak*, 216 F.3d at 311.

In support of its contention that a Section 10(b) claim can be pursued against Audit Committee members based on their failure to exercise strict oversight, plaintiffs direct the Court to three cases, none of which supports a holding that the claim is adequately pleaded. In F*iller v. Lernout*, 286 B.R. 33 (D.Mass.2002), the audit committee consistently ignored the outside accountant's recommendations that the company implement a system of internal audit controls, failed to deliver on its own *commitment to recommend an internal auditor*, and had received reports identifying specific questionable transactions relating to the fraud. *Id.* at 37–38. In *Greenfield v. Prof. Care, Inc.*, 677 F.Supp. 110 (E.D.N.Y.1987), the audit committee members appeared to function as inside di-

rectors and either knew of the fraud or were reckless in disregarding it. *Id.* at 115. *In re JWP*, 928 F.Supp. 1239, addressed a summary judgment motion.

### Galesi and Kellett: motive and opportunity

■ The Complaint alleges that Galesi and Kellett possessed the motive and opportunity necessary to establish scienter. The SEC Forms 4 reporting Galesi's sales disclose that the sales were by banks "pursuant to loan documents." [15] Sales made by a bank to satisfy margin calls are insufficient allegations of motive.

■ The allegations regarding Kellett stand on a different footing. According to the Complaint, he provided substantial assistance to and received substantial, irregular benefits from or through Ebbers. In addition, while his sales of stock did not occur at or near the peak price for World-Com's stock, the sales guaranteed for him the receipt of tens of millions of dollars in a declining market, before the revelations of the fraud decimated the stock's price, and amounted to a significant percentage of his holdings. Taken together, these allegations are sufficient to create a strong inference of Kellett's fraudulent intent.[16]

Since the Complaint does not allege facts supporting a strong inference that the Audit Committee Director Defendants acted with fraudulent intent, the Section 10(b) claim against them in Count VI is dismissed with leave to amend.[17] The motion to dismiss the Section 10(b) claim against Kellett is denied.

### Section 20(a)

■ The Complaint has adequately alleged a primary Section 10(b) violation by at least WorldCom, Ebbers and Sullivan, and control of them by the Director Defendants. The Complaint alleges that by reason of their board and committee membership, Director Defendants are liable as "control persons" in that these defendants did control false public statements that constitute the heart of the fraud, can be presumed to have controlled the fraud's underlying transactions, and had the power to direct WorldCom's management and activities.

Where it is alleged that a defendant signed an SEC filing that contained the misrepresentations that are the subject of the Section 10(b) claim, this is sufficient to allege control of the authors of the filing, and the management and policies of the corporation behind the misrepresentations. *See, e.g.*, 17 C.F.R. § 240.12b; *Thomson Kernaghan*, 2000 WL 640653, at *7; *In re Livent*, 78 F.Supp.2d at 222 (while signing was presumed to reflect control, the court dismissed for failure to plead culpable participation); *Jacobs v. Coopers & Lybrand, LLP*, No. 97 Civ. 3374(RPP), 1999 WL 101772, at *17 (S.D.N.Y. Mar. 1, 1999).

The Director Defendants urge that the signatures on SEC filings should not be sufficient to allege control since they are required by virtue of their status to sign annual reports and registration statements. They protest that if a signature that is required by law is sufficient to plead control then "every director will automatically be deemed to have control based solely on his or her status."

There are several responses to this protest. First, what is at issue here is the sufficiency of pleadings under Rule 8. In

---

**15.** The Forms 4 are properly considered on a motion to dismiss. *Rothman*, 220 F.3d at 88.

**16.** Kellett does not contest that the allegations of opportunity are sufficient.

**17.** Plaintiffs report in their memorandum in opposition to this motion that the WorldCom bankruptcy examiner's report of November 4, 2002 contains evidence that the Audit Committee was recklessly derelict in its oversight duties.

that regard, it is important to remember that Section 20(a) contains a good faith defense. Second, the allegation that a Director signed a Form 10–K or a registration statement may not be sufficient to allege control over the person who is alleged to have violated Section 10(b) when the misrepresentation or omission at issue in the Section 10(b) claim does not appear in those documents; that is an issue not presented by the motion. Third, the ruling here reflects the scheme established by Congress. It has imposed a heightened pleading standard for a Section 10(b) claim but not for a Section 20(a) claim.[18] If a plaintiff succeeds in pleading a Section 10(b) violation, then Congress has determined that those who control that violator may be sued too. Finally, as a practical matter, just what is a signature on an SEC filed document meant to represent if it does not represent a degree of responsibility for the material contained in that document? The very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents. As the SEC explained when it announced the requirement in 1980:

> With an expanded signature requirement, the Commission anticipates that directors will be encouraged to devote the needed attention to reviewing the Form 10–K and to seek the involvement of other professionals to the degree necessary to give themselves sufficient comfort. In the Commission's view, this added measure of discipline is vital to the disclosure objectives of the federal

securities laws, and outweighs the potential impact, if any, of the signature on legal liability.

Integration of Securities Act Disclosure Systems, Amendments to SEC Rules 17 C.F.R. Parts 229, 231, 239, 240, 241 & 249, Releases Nos. 33–6231, 34–17114; AS–279, 45 F.R. 63630 (Sept. 25, 1980).

Each of the Director Defendants signed multiple disclosures filed with the SEC that are alleged to have contained actionable misrepresentations, including Forms 10–K and registration statements. These approvals through signing sufficiently allege control over those who have been alleged to have violated Section 10(b), at least in connection with the misrepresentations and omissions in those documents. The motion to dismiss Count VII is denied.

**Underwriter Defendants**

 The Complaint pleads claims pursuant to Sections 11 and 12(a)(2) against the Underwriter Defendants arising from material misstatements or omissions in the 2000 and 2001 Registration Statements, including the prospectuses and oral communications, in connection with the 2000 and 2001 Offerings. The Underwriter Defendants seek to dismiss all of the claims against them on the ground that NYSCRF does not have standing to sue them since it has not alleged that it purchased any WorldCom bonds in either the 2000 or 2001 Offerings. These defendants assert that the inclusion of the other three named plaintiffs, who do allege that they bought bonds in those Offerings, does not cure the standing deficiency because (1) they were not appointed co-lead plaintiff under the process set forth in the PSLRA, 15 U.S.C. § 77z–1(a)(3)(B) (Securities Act); 15 U.S.C. § 78u–4(a)(3) (Exchange Act), and (2) the Complaint identifies only the NYSCRF as the party bringing this action

18. Indeed, if Section 20(a) contained the requirement that scienter be pleaded and proved, there would be little purpose served

by Section 20(a) since a defendant who acts with scienter is liable under Section 10(b).

"individually and on behalf of all other persons and entities who purchased or acquired publicly traded shares, bonds or notes of WorldCom." These related arguments confuse the inquiries to be made at three separate stages of this action: the appointment of lead plaintiff, the motion to dismiss, and the motion to certify a class.

The first of these stages—appointment of lead plaintiff—was "intended to empower investors so that they, not their lawyers, control securities litigation." [19] Private Securities Litigation Reform Act of 1995, S.Rep. No. 104–98, 104th Cong. 1st Sess. 1, 6 (1995), *reprinted in* 1995 U.S.S.C.A.N. 679, 685. If multiple plaintiffs file class actions asserting substantially the same claims, the PSLRA creates a presumption that the plaintiff with the largest financial interest and who otherwise satisfies the requirements of Rule 23, Fed.R.Civ.P., should serve as the lead plaintiff. 15 U.S.C. § 77z–1(a)(3)(B)(iii)(I). That presumption can be rebutted *"only upon proof by a member of the purported plaintiff class"* that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class" or is subject to "unique defenses" that prevent the plaintiff from adequately representing the class. 15 U.S.C. § 77z–1(a)(3)(B)(iii)(II) (emphasis supplied). The statute also directs that "the most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 77z–1(a)(3)(B)(v).

The PSLRA sets out a timetable for the choice of lead plaintiff. Any person who wishes to be chosen as lead plaintiff, whether or not they have filed a complaint, has sixty days from the date of publication of notice pursuant to the PSLRA to apply for appointment. 15 U.S.C. § 77z–1(a)(3)(A) and (B). The statute directs that "as soon as practicable" after a decision on the motions for consolidation is rendered that the court appoint the most adequate plaintiff as lead plaintiff. 15 U.S.C. § 77z–1(a)(3)(B)(ii).

As the statute's language and structure demonstrate, the lead plaintiff provisions are designed to promote the selection at an early stage of the litigation of an institutional investor with the largest financial stake in the action so that that party can control the course of the litigation. It is not intended to substitute for the class certification process, nor is it intended to choose the most adequate *complaint* filed.

In this case, the application period closed on July 1, 2002. The selection of NYSCRF as lead plaintiff was relatively straightforward. Only one group of plaintiffs competed with NYSCRF for the appointment.[20] They were not institutional investors and their losses, even if it were appropriate to aggregate them, were not in the same order of magnitude as the losses suffered by NYSCRF.

After appointment, the lead plaintiff in a consolidated class action files a consolidated amended complaint asserting the class claims. NYSCRF was appointed lead plaintiff on August 15, 2002, and directed by Order of this Court to file an amended

---

**19.** The PSLRA provisions for class actions as a whole are designed to insure that investors, not lawyers, drive the lawsuit (and, as importantly) any settlement negotiations. In addition to the lead plaintiff provisions, the amendments require plaintiffs filing on behalf of a class to file a sworn certification stating that they have reviewed and authorized the complaint, that they did not purchase the securities at the direction of counsel or in order to pursue litigation, and limiting the number of class actions in which a plaintiff can serve as a class representative during any three year period. 15 U.S.C. § 77z–1(a)(2)(A).

**20.** All other candidates withdrew in favor of NYSCRF, reserving their right to renew their applications in the event NYSCRF was not selected as the lead plaintiff.

complaint for the consolidated actions by October 11, 2002. The Complaint asserts class claims on behalf of those who invested in WorldCom securities, including both stocks and bonds, and names three additional plaintiffs. In filing the Complaint, lead plaintiff fulfilled its obligation to assess the causes of action available to the class, to plead those claims in the consolidated amended complaint, and to identify as named plaintiffs any additional class representatives that were necessary to assert the claims.

The Underwriter Defendants suggest that this Court now require "a few other plaintiffs to join with NYSCRF as lead plaintiff" in order to address their perception that a lead plaintiff must have standing to bring Sections 11 and 12(a) claims in order for such claims to be filed against them. The time for the selection of lead plaintiff is over. While the PSLRA certainly envisions appointment of co-lead plaintiffs, there was no competitor or group of competitors for the position of lead plaintiff that presented any serious challenge on the merits to the application made by NYSCRF when measured by the standards that apply to selection of lead plaintiff. *In re Initial Public Offering Litig.*, 214 F.R.D. 117, 120 (S.D.N.Y.2002). The argument that NYSCRF did not and does not have standing in this lawsuit because it does not have standing to bring claims based on the 2000 and 2001 Offerings blinks reality and requires no further discussion.

The Underwriter Defendants have not shown that there is any legal bar to a lead plaintiff asking other plaintiffs to join a lawsuit as named plaintiffs in order to represent more broadly the interests of the class at the time of the filing of the consolidated class complaint. Long before passage of the PSLRA, it was well established that named plaintiffs may jointly represent the class and it is their claims that determine whether there is standing to bring the claims alleged on behalf of the class. *See In re IPO Litig.*, at 122–23.

While it is true that a plaintiff must have standing to bring the claims asserted in a lawsuit, there is no dispute that the Complaint has adequately alleged that at least FCERA and Fresno have standing to assert claims based on the two Offerings.[21] They each allege a personal stake in the outcome of the controversy sufficient to establish standing. *See Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Demaria*, 318 F.3d at 173 n. 3.

There is also no dispute that the claims brought in the Complaint are properly joined. The claims addressed specifically to the two Offerings rely on the same course of conduct that underlies the claims addressed more generally to WorldCom's securities, and even rely on the same SEC filings and public announcements, which were either included, copied, or incorporated by reference in the Registration Statements. While the Complaint states that NYSCRF brings this action in a representative capacity, and does not have identical language for the co-named plaintiffs, their explicit designation as "additional named plaintiffs" and the assertions that their claims are typical of the claims of the members of the class, and that they will fairly protect the interests of the other members of the class, make it sufficiently clear that they also bring suit as additional class representatives.[22] Whether the four

---

**21.** The Underwriter Defendants challenge the standing of HGK to bring securities claims since it is a registered investment advisor and does not, according to the defendants, sufficiently allege ownership of the securities.

Since FCERA and Fresno clearly have standing, it is unnecessary to reach this argument on this motion to dismiss.

**22.** To remove any ambiguity, plaintiffs are given leave to amend the pleading.

plaintiffs named here will in fact be adequate class representatives will be determined at the time that the class certification motion is litigated.

The Underwriter Defendants also complain of the Complaint's organization, that is, its decision to bring one Section 11 claim based on both Offerings, and one Section 12(a)(2) claim also based on both Offerings. They point out that not every underwriter defendant participated in each Offering and that neither FCERA nor Fresno participated in both Offerings. The Complaint adequately alleges which underwriters and which named plaintiffs participated in which Offerings. The motion to dismiss on this ground is denied.

**Section 12(a)(2)**

The allegations in Count V are sufficient to state a claim under Section 12(a)(2). The Underwriter Defendants move to dismiss the Section 12(a)(2) claim on two grounds. First, they argue that each named plaintiff that bought WorldCom bonds in the Offerings has failed to allege facts demonstrating that it purchased its bonds from each Underwriter Defendant or pursuant to solicitation from each Underwriter Defendant. Without such allegations, the defendants argue that the plaintiffs have failed to plead sufficient facts to show their standing to bring this claim against any Underwriter Defendant.

■ The standing of FCERA and Fresno to bring these claims as representatives of those members of the class that purchased in the two Offerings is sufficiently pleaded by, among other things, the allegations that these two named plaintiffs purchased WorldCom debt securities in the two Offerings, that the Underwriter Defendants participated in the solicitation and sale of the notes in the Offerings pursuant to the Registration Statements, that the solicitations were motivated at least in part by the desire of the Underwriter Defendants to serve their own financial interest and the interest of WorldCom, and that the Underwriter Defendants actively solicited the sale of the notes issued in the Offerings by participating in "road show" meetings. These allegations are sufficient to allege privity between FCERA or Fresno and each of the Underwriter Defendants that participated in Offering in which these named plaintiffs participated. While the Complaint does not identify from which defendant either named plaintiff purchased its notes, it does contain sufficient allegations, when judged against the requirements of Rule 8, Fed.R.Civ.P., to give the Underwriter Defendants fair notice of the basis for the claims against them, to wit, that they solicited the named plaintiffs in the sale of the notes or sold notes to them. *See, e.g., In re Twinlab Corp. Sec. Litig.,* 103 F.Supp.2d 193, 204 (E.D.N.Y.2000); *In re American Bank Note Holographics,* 93 F.Supp.2d at 438.

■ Second, the Underwriter Defendants contend that the Section 12(a)(2) claim must be dismissed because the plaintiffs must offer to tender their WorldCom bonds to the Underwriter Defendants before bringing suit. Section 12(a)(2) does not offer any guidance as to the time at which a tender or offer of tender must occur. It has long been established, however, that "an offer to tender contained in the complaint will suffice." *Wigand v. Flo–Tek, Inc.,* 609 F.2d 1028, 1034 (2d Cir.1979). A complaint's demand for rescission is construed as an implicit offer to tender. *Id.* at 1035.

The Complaint does not contain an explicit offer to tender or even a demand for rescission. Section 12(a)(2) does not allow a plaintiff, however, any choice of remedy. "If plaintiff owns the stock, he is entitled to rescission but not damages. If plaintiff no longer owns the stock, he is entitled to damages but not rescission." *Id.* By

pleading their Section 12(a)(2) claim, plaintiffs have already signaled to the Underwriter Defendants their claim for the relief to which that provision of the securities laws entitles them. The plaintiffs may amend their pleading to make their offer of a tender and a demand for rescission explicit.

### SSB, Grubman, and Citigroup

The SSB Defendants are named in five claims in the Complaint. Claims IV and V allege violations of Sections 11 and 12(a)(2), respectively, against SSB and the other Underwriter Defendants in connection with the two Offerings. In particular, Claim IV alleges that SSB did not make a reasonable investigation and did not possess a reasonable basis for believing that the statements in the Registration Statements for the two Offerings were true. It also alleges that SSB had a duty to disclose in the Registration Statements its conflicted relationship with WorldCom. SSB has incorporated by reference the arguments made by the other Underwriter Defendants in moving to dismiss those claims.[23] It has explicitly declined at this time to address its alleged duty to disclose in the Registration Statements the conflicted relationship between SSB and WorldCom.

The remaining three claims against the SSB Defendants name them alone. Count IX pleads that SSB and Grubman violated Section 10(b) in connection with WorldCom's 2000 and 2001 Offerings through misrepresentations and omissions concerning (1) WorldCom's true financial condition in the Registration Statements for the Offerings and (2) the illicit *quid pro quo* relationship between WorldCom and Ebbers, among others, on the one hand, and the SSB Defendants on the other. Count X pleads that SSB and Grubman violated Section 10(b) in connection with Grubman's analyst reports on WorldCom through misrepresentations and omissions concerning WorldCom's true financial condition and SSB's conflicted position with WorldCom. Count XI pleads that SSB and Citigroup violated Section 20(a) as controlling persons in connection with Grubman's analyst reports.

The SSB Defendants make three arguments. First, they argue that there are no factual allegations that they "knew" that WorldCom had falsified its financial reports, and the analyst reports were "predicated on" the accuracy of those reports. Second, they contend that there are insufficient factual allegations to support any pleading that the concealment of the *quid pro quo* relationship or that their description of WorldCom's financial condition caused any loss to the plaintiffs. Finally, they argue that they cannot be held liable for a violation of Section 10(b) for failure to disclose the illicit relationship between SSB and WorldCom since the analyst reports disclosed all of the information that the National Association of Securities Dealers ("NASD") and the New York Stock Exchange ("NYSE") regulations required them to disclose.

As is apparent from this outline, the motion by the SSB Defendants principally addresses the analyst report claim made in Count X. The SSB Defendants do not contend that there are insufficient allegations that SSB or Citigroup are controlling persons under Section 20(a); as noted, they do not address the Complaint's allegations in Count IV that SSB had a duty under Section 11 to disclose the *quid pro quo* relationship in connection with the Regis-

---

**23.** SSB argues briefly in this connection that NYSCRF does not have standing to bring claims concerning the two Offerings since it did not purchase any bonds in those Offer-ings. This argument has already been addressed in connection with the more extensive arguments made by the Underwriter Defendants concerning this issue.

tration Statements for the two Offerings; and, they do not present any developed argument concerning the fraud claims in Count IX arising out of the Registration Statements.

### Scienter

■■■ The Complaint sufficiently alleges scienter with respect to the analyst reports, not only for the failure to disclose the *quid pro quo* relationship but also for the misrepresentations concerning WorldCom's financial condition. In each instance it does so with detailed and sufficient allegations both of conscious misbehavior or recklessness, and of motive and opportunity.

The SSB Defendants do not dispute that there are sufficient allegations that SSB and Grubman knew of the illicit relationship. There are also sufficient allegations that Grubman and SSB knew enough about WorldCom's actual financial condition to understand that their descriptions of that condition in the analyst reports were false and misleading. The Complaint describes an unusually close relationship for a purported analyst and the company on which he is reporting, including Grubman's attendance at WorldCom Board meetings where two of WorldCom's most significant acquisition candidates were discussed. It also describes strong circumstantial evidence that Grubman learned of at least the capital expenditure fraud. It describes his change in the analytical model for valuing WorldCom, a change in valuation modeling that he initially adopted for WorldCom alone of all of the telecommunications companies on which he reported. This alteration in modeling is alleged to have had the effect of concealing the capital expenditure fraud. While this allegation alone would be sufficient to allege knowledge of the fraud, the Complaint also alleges repeated misstatements regarding the value of the securities of SSB's investment banking clients, and admissions that the contents of SSB's analyst reports were improperly affected by pressure from the SSB investment bankers. There are also particularized allegations that SSB senior management was aware of the concerns about the integrity of Grubman's reports.

Grubman and SSB's scienter has also been adequately pleaded through allegations of their motive and opportunity to commit the fraud. Again, the SSB Defendants do not dispute that there are sufficient allegations that SSB and Grubman had a motive and opportunity to commit a fraud in connection with the alleged omissions in the analyst reports of any meaningful description of the *quid pro quo* arrangement. There are also sufficient allegations that they had a motive and opportunity not to report accurately on WorldCom's financial condition. The motive allegations include the concrete and extraordinary benefits each is alleged to have received as a result of their unique relationship with WorldCom. Grubman is alleged to have received extraordinary compensation directly as a result of his involvement in the investment banking business. SSB is similarly alleged to have won WorldCom investment banking engagements in over a score of transactions and to have earned fees of over $107 million in just a five year period. The Complaint also adequately alleges that SSB and Grubman had the opportunity to achieve these concrete benefits. *Novak,* 216 F.3d at 307.

The SSB Defendants argue that the allegations of scienter are insufficient because they are conclusory. The allegations are not conclusory; they are detailed and abundant. They also protest that the Complaint is devoid of any facts suggesting that the SSB Defendants actually had access to WorldCom's internal books and ledgers or control over those records. Allegations of access to or control over such

records are not necessary. Plaintiffs are only required to plead with particularity sufficient facts to provide a strong inference of scienter with respect to the alleged misrepresentations made by Grubman and SSB in the analyst reports or the Registration Statements. They have done so.

In a similar vein, the SSB Defendants argue that there are insufficient allegations that they "participated" in the WorldCom fraud. If by that they mean that there are insufficient allegations that the SSB Defendants either devised the accounting strategies that resulted in the manipulation of WorldCom's books and records, or that they directed the WorldCom employees in making the false entries into those books and records, they miscomprehend the nature of the Complaint's allegations. The Complaint seeks to hold the SSB Defendants liable for their own alleged misrepresentations and omissions. Whether they created or directed the fraud within WorldCom is beside the point. If the plaintiffs have succeeded in adequately pleading that the SSB Defendants acted with scienter in making material misrepresentations or omissions in documents that the SSB Defendants authored, then the plaintiffs have stated a violation of the federal securities laws.

The SSB Defendants argue that the Court should take judicial notice of Grubman research reports that they have submitted in support of this motion, reports that they contend demonstrate that Grubman altered the methodology he used to value WorldCom, not in early 2000, as the Complaint alleges, but as early as mid–

1999. The Complaint alleges that by late 1999, the utility of Grubman's traditional model had "become seriously imperilled due to increasing capital expenditures that were cutting deeper and deeper into WorldCom's revenues." Even if the Grubman research reports presented by the defendants were appropriately considered on this motion, it would not affect the strength of the allegations that Grubman's decision to alter the model had the effect of concealing the capital expenditure fraud and that it was an alteration he made for WorldCom and, for at least two years, for none of the other telecommunications companies on which he reported. Both of these allegations create a strong inference of scienter. The significance of the change in modeling occurring in mid–1999 and not in early 2000 must await that point in the litigation where it is appropriate to address the merits of the claims.[24]

The SSB Defendants argue that the plaintiffs have the burden of identifying in their pleading the source of any allegation made on information and belief. They have not identified which allegations are vulnerable to this attack. The Complaint is replete with citation to material to support its allegations, including Grubman's research reports, SSB's e-mails, reports of income as presented to Congress and as reflected in public filings, investigations by United States Congressional committees, the New York State Attorney General's Office, the SEC, the NASD, and the NYSE, press reports and witness interviews. The plaintiffs have pleaded with

---

24. At oral argument, counsel for the SSB Defendants presented two of Grubman's analyst reports of WorldCom, one for August 20, 1999 and another for January 9, 2001. The first announces that WorldCom "remains our favorite stock, and we would be aggressive buyers at these prices." At that time, WorldCom was trading at over $75.75 per share. The second begins "[w]e strongly reiterate our Buy rating on WorldCom." It was then trading at under $20. SSB Defendants point out that the reports contain not only the new valuation model that the Complaint alleges Grubman used solely for WorldCom, but also the traditional valuation model. The significance of both valuation models appearing in two of the reports issued over the course of a seventeen month period must await trial.

particularity the facts upon which their allegations rest. *See* 15 U.S.C. § 78u–4(b)(1); *Novak*, 216 F.3d at 312–14.

Next, the SSB Defendants contend that, in the event that the Court agrees that there are insufficient allegations that they knew or had the opportunity to learn that WorldCom's financial information was false, the portion of Count X that addresses the analyst reports of WorldCom's financial condition must be dismissed since plaintiffs failed to make particularized allegations that Grubman's opinions regarding WorldCom's financial status were not genuinely held.

In making their argument that Grubman's descriptions of WorldCom's financial condition were simply statements of opinion and expressions of optimism held in good faith, the SSB Defendants rely on Grubman's choice of language in the reports, including phrases such as "we think" and "we feel" and the following cautionary language in each of his reports:

> Although the statements of fact in this report have been obtained from and are based upon sources that the Firm believes to be reliable, we do not guarantee their accuracy, and any such information may be incomplete or condensed. All opinions and estimates in this report constitute the Firm's judgment as of the date of this report and are subject to change without notice.

Even if the passages in the reports describing WorldCom's financial condition could be classified as nothing more than statements of Grubman's opinion, the plaintiffs have sufficiently alleged that Grubman did not render those opinions in good faith.[25] They have alleged with particularity sufficient facts showing that, at a

minimum, Grubman was not functioning as an independent analyst, but had been corrupted, and withheld from his readers his serious concerns about the accuracy of the WorldCom financial information that he was conveying to them and about the reliability of his advice to them. Moreover, the cautionary language on which the defendants rely does not come close to providing a sufficient warning of Grubman's skepticism about the WorldCom data he was presenting to his readers and his skepticism about his own repeated, forceful recommendations that investors should buy WorldCom securities. "The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y.1996).

Finally, the SSB Defendants invoke in passing the "duty to disclose" doctrine. This doctrine provides that defendants generally are liable for omissions only if they have a duty to disclose the withheld information. *See Basic*, 485 U.S. at 239 n. 17, 108 S.Ct. 978; *In re Time Warner*, 9 F.3d at 267. The doctrine has been applied in several contexts. For instance, it requires corrective disclosures from those who have made statements that are rendered misleading by subsequent events. *See, e.g., In re Time Warner*, 9 F.3d at 267–68. It also protects from liability those who come into possession of material information but remain silent, unless they also have disclosure obligations. *See, e.g., Dirks v. SEC*, 463 U.S. 646, 653–55, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983).

---

**25.** The Court assumes that the complete text of the analyst reports on which the plaintiffs rely in their Complaint are properly considered on the motion to dismiss. *See Rothman*, 220 F.3d at 88. Nonetheless, many of the arguments and materials presented by the SSB Defendants in connection with the analyst reports are more properly reserved for a motion for summary judgment or for trial.

Those who choose to speak, however, must speak honestly—not in half-truths, in bad faith, or without a reasonable basis for their statements. *See Caiola v. Citibank, N.A.,* 295 F.3d 312, 330–31 (2d Cir.2002); *In re Credit Suisse First Boston Corp. Sec. Litig.,* No. 97 Civ. 4760(JGK), 1998 WL 734365, at *6 (S.D.N.Y. Oct. 20, 1998). When a person speaks, but chooses to omit information, the liability for that omission will be judged by its materiality. *See Halperin,* 295 F.3d at 357. The SSB Defendants were in the business of speaking to the public about stock values. They spoke forcefully and frequently about the value of WorldCom. Having spoken, the SSB Defendants may be held accountable for any material omissions in those statements.

### Loss Causation

■ The SSB Defendants challenge the pleading of loss causation in the context of the financial information contained in the analyst reports and in the context of their failure to disclose their illicit relationship with WorldCom in those reports. They contend that the Complaint fails to plead adequately that the subsequent disclosure of accurate information about these two issues caused the price of WorldCom's securities to drop.

The Complaint allows the defendants to identify the plaintiffs' theory of loss causation and to permit a court to determine whether an inference of proximate cause is, at least at this stage of the litigation, viable as a matter of law.[26] Taking the allegations in the Complaint as true, it was reasonably foreseeable that the loss the plaintiffs allege that they suffered was a natural consequence of the alleged misrepresentations and omissions in the Grubman analyst reports. It was reasonably foreseeable that the unmasking of those misrepresentations and omissions would affect not only the price of WorldCom's securities, but also, given the magnitude and nature of the alleged misrepresentations and omissions and the prominence of Grubman's role as a WorldCom and telecommunications industry analyst, the economic health of WorldCom itself. The causal chain is not so attenuated that the SSB Defendants should be dismissed from this action.[27]

The SSB Defendants have presented evidence and arguments intended to establish that the stock market "ignored or rejected the SSB analysts' bullish valuations of WorldCom shares." Should the SSB Defendants believe that they can prove that to be true, they will have an opportunity to do so at a later stage of this litigation, when it is appropriate to weigh the parties' competing evidentiary submissions. On this motion, the plaintiffs' allegations are taken as true. This is not a case in which the Complaint itself has

---

**26.** *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763 (2d Cir.1994), on which the SSB Defendants rely, is not to the contrary. The district court had dismissed the RICO complaint in *First Nationwide* for failure to plead sufficient facts from which a court could determine that the defendant's alleged misrepresentations about the value of apartment complexes posted as collateral for a bank loan were sufficiently material so that the misrepresentations could be considered a proximate cause of the bank's claimed injury. Given the complexity of the New York real estate market and the fact that the plaintiff's losses came in the wake of a downturn in the real estate market, the court required the plaintiff to "allege loss causation with sufficient particularity" such that the court could "determine whether the factual basis for its claim, if proven, could support an inference of proximate cause" for the loss. *Id.* at 770.

**27.** The plaintiffs have described additional particularized allegations concerning loss causation, including the impact on WorldCom's stock price of early disclosures about the compromised relationship between WorldCom and Grubman, that they can add to an amended complaint should further amendment be required.

identified a supervening cause such that it has undermined its pleading of loss causation.

The SSB Defendants also contend that the Complaint alleges that the sole reason for the collapse in the price of WorldCom stock was the accounting fraud. They argue that such an allegation directly contradicts any "conclusory assertion" that the disclosures about the illicit relationship between WorldCom and the SSB Defendants also caused the decline in the stock price.

The Complaint does not allege that the sole reason for the collapse was the accounting fraud and the SSB Defendants have not cited any passage of the Complaint that fairly supports that argument. When read with the degree of deference to which a complaint is entitled and when read as a whole, the Complaint describes a synergy between the misrepresentations and omissions in the analyst reports and the public perception of the value of WorldCom securities. For example, had Grubman disclosed the extent to which SSB's relationship with WorldCom was riddled with conflicts, it is reasonable to infer that the impact on the market of his alleged misrepresentations about World-Com's financial condition would have been dramatically lessened. Conversely, given Grubman's historical role in creating demand for WorldCom securities, when the alleged illicit relationship came to light, the disclosure contributed to the decline in the price of WorldCom's securities. Whether the plaintiffs will be able to prove that their losses were caused in part by these omissions will be determined later in this litigation. The Complaint, however, adequately alleges that both prongs of their fraud theory were interdependent and responsible for the losses incurred.

The Second Circuit recently endorsed a theory of loss causation that bears a striking resemblance to the plaintiffs' theory that their loss was caused in part by the alleged omission of an adequate disclosure about the relationship between the SSB Defendants and WorldCom. In *Suez Equity*, 250 F.3d 87, the Second Circuit reaffirmed the finding decades earlier in *Marbury Management*, 629 F.2d at 707, that loss causation was present when a trainee at a brokerage firm falsely claimed that he was a stock broker. *Suez Equity*, 250 F.3d at 97. The misrepresentation by the trainee related to the value of the shares because it related to

> the reliability of the trainee's valuation.... [H]ad plaintiffs known the seller in *Marbury Management* was an inexperienced trainee without expertise they would not have accepted his recommendations to buy stock. Such a misrepresentation, we thought, misled plaintiffs with respect to the "investment quality" of the stock, although the misrepresentation was not directly related to the stock's intrinsic investment characteristics. Thus, because the misrepresentation in *Marbury Management* induced the purchase (transaction loss) and related to the stock's value (loss causation), it was causally related to the loss.

*Id.* Here, the plaintiffs have alleged that the material omissions concerned the integrity and reliability of the premier analyst for the telecommunications industry. As was true in *Marbury Management*, these alleged omissions are sufficiently related to the value of the stock recommended by Grubman to satisfy the requirements for pleading loss causation.

### Compliance with NASD and NYSE Regulations

▮▮▮ In their third and final argument, the SSB Defendants contend that the analyst reports disclosed SSB's relationship with WorldCom to the extent required by NASD and NYSE regulations, and Section 10(b) does not require anything beyond

such compliance. They contend that each of the reports disclosed that SSB underwrote WorldCom securities and engaged in other business dealings with WorldCom. It presents the following example of its disclosures:

> Within the past three years, Salomon Smith Barney, including its parent, subsidiaries and/or affiliates, has acted as manager or co-manager of a public offering of the securities of this company....
>
> Salomon Smith Barney, including its parent, subsidiaries and/or affiliates ("the Firm"), may from time to time perform investment banking or other services for, or solicit investment banking or other business from, any company mentioned in this report.... The Firm, or any individuals preparing this report, may at any time have a position in any securities or options of any of the issuers in this report. An employee of the Firm may be a director of a company mentioned in this report.

The regulations with which the SSB Defendants contend that they complied are the NASD requirements that research reports disclose that the issuing firm "usually makes a market in the securities being recommended, ... or that the member or associated persons will sell to or buy from customers on a principal basis," NASD Manual Conduct Rule 2100(d)(2)(B)(i)(a), and that the firm "and/or its officers or partners own options, rights or warrants to purchase any of the securities of the issuer whose securities are recommended," *id.* at (B)(i)(b). The NYSE has parallel requirements. Although not cited by the defendants, the NASD also requires that

> All member communications with the public shall be based on principles of fair dealing and good faith and should provide a sound basis for evaluating the facts in regard to any particular security or securities.... *No material fact or qualification may be omitted if the omission, in the light of the context of the material presented, would cause the communication to be misleading.*

NASD Manual, Conduct Rule 2210(d)(1)(A) (2000) (emphasis supplied).

■ Where the SEC has decided what type of disclosure is necessary to reveal to the public a particular conflict of interest, and has enacted regulations to enforce that decision, courts will not impose greater disclosure obligations under the rubric of Section 10(b) or Rule 10b–5. *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 131 (2d Cir.2000). To do otherwise would "undermine" the SEC's interpretation of its own regulations. *Id.* In *Quick & Reilly*, the defendants had complied with Rule 10b–10, 17 C.F.R. § 240.10b–10, which requires broker-dealers to disclose the amount of remuneration they receive from third parties in connection with customer transactions. *Id.* at 126.

The argument based on these defendants' purported compliance with specific disclosure requirements of the NASD and NYSE is unavailing. The boiler-plate disclosures contained in the analyst reports do not provide notice to the public of the omissions alleged by the plaintiffs, and the SSB Defendants do not present any developed argument suggesting that they do. Whether the SSB Defendants violated Section 10(b) by failing to disclose material information is an issue of fact that must await a determination during summary judgment motion practice or at trial. *DeMaria*, 318 F.3d at 180. A few observations may nonetheless be appropriate given the arguments raised about SSB's legal obligations.

In determining their liability under the securities laws, it will be relevant to assess the compliance of the SSB Defendants with not only the specific but also the general disclosure requirements in

the relevant regulations. *Id.* at 179–80. Having chosen to speak to the investing public through the issuance of the analyst reports, they had an obligation to communicate in good faith and to disclose material information. To the extent that there is a substantial likelihood that a fuller and more specific disclosure of their relationship to WorldCom would have been considered by a reasonable person to be important when deciding, based on the information conveyed in the analyst reports, to buy or sell WorldCom securities, then the omission of that disclosure may be found by a fact finder to have been a material omission. *Halperin,* 295 F.3d at 357. The Complaint adequately alleges that the omissions affected the "total mix of information" available to investors and misled reasonable investors. *Id.; see also Basic,* 485 U.S. at 231–32, 108 S.Ct. 978. The SSB Defendants contend that the plaintiffs are improperly seeking to hold them liable for violating the disclosure requirements added to the NASD and NYSE regulations following discovery of the conduct that lies at the heart of this Complaint. They are wrong. The above-recited principles of law are well-established and long predate the events at issue here and the recent amendments to the regulations.

Finally, the argument that the SSB Defendants had no duty to make further disclosures than they did because the information regarding their relationship with WorldCom was already in the public domain is also premature. Such disputes over facts are not appropriate for a motion to dismiss.

### Conclusion

The motions to dismiss are denied with the following exceptions. The motions by the Andersen Defendants have not yet been considered. The motion by the Audit Committee Defendants to dismiss the Section 10(b) claim against them in Count VI

is granted. The plaintiffs are granted leave to amend the Complaint to restate those Section 10(b) claims, to make explicit their tender offer and demand for rescission in connection with their Section 12(a)(2) claim, and to make explicit that the additional named plaintiffs are, along with NYSCRF, suing in a representative capacity.

SO ORDERED.